# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 16, 2012

No. 11–30158

Lyle W. Cayce
Clerk

ROGER L. POOLE,

Plaintiff - Appellant

v.

CITY OF SHREVEPORT; POLICE DEPARTMENT OF SHREVEPORT; MIKE VANSANT; JOHN D. STALNAKER; J. CREIGHTON,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana

Before BARKSDALE, GARZA, and ELROD, Circuit Judges.

GARZA, Circuit Judge:

This appeal arises out of the alleged use of excessive force in the arrest of Roger L. Poole ("Poole") following a traffic stop in Shreveport, Louisiana.  Poole, the Plaintiff-Appellant, appeals the district court's grant of summary judgment for the defendants on his 42 U.S.C. § 1983 claims.  We AFFIRM.

No. 11–30158

# I

This case arises out of allegedly excessive force that Poole contends two officers used against him. A videotape, captured by a camera mounted on a police car, recorded most of the events underlying Poole's claims.[1]

Corporal J. Creighton ("Creighton"), a member of the Shreveport Police Department, was not on duty on the morning of December 19, 2006. Dressed in plain clothes, he drove down Shreveport's stretch of Interstate 20 in his personal pick-up truck. He tailgated Poole, who was driving a large truck—a semi-tractor with no trailer attached. Poole, to get Creighton off his tail, threw something at Creighton's car, splattering it with liquid. Creighton radioed the dispatcher and requested the assistance of a marked unit. Sergeant John D. Stalnaker ("Stalnaker") responded, first turning on his emergency lights and then, after Poole did not pull over, deploying his siren. Poole pulled his truck off the interstate into an empty lot. Stalnaker, trailed by Creighton, approached Poole's truck.

Stalnaker ordered Poole to exit the cab of his truck. Poole complied. Poole was unable to produce proof of insurance and smelled of alcohol. Creighton led Poole to the back of Poole's truck where he patted him down while Stalnaker investigated the inside of the cab. The officers found no weapons or contraband on Poole or in his truck. Stalnaker administered a field sobriety test, and Poole admitted that he had consumed at least half of a sixteen-ounce beer that morning. Poole passed the sobriety test. Another officer came to the scene with a citation book and confirmed that Poole did not have insurance.

---

[1] This videotape significantly aids our understanding of these events. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (instructing that courts should view purported facts in dispute "in the light depicted by the videotape."). Neither the tape's admissibility nor its contents are in dispute.

No. 11–30158

During this time, Poole asserts that Creighton began to verbally threaten and challenge him. Poole continued to accuse Creighton of tailgating him. It is undisputed that amidst this tension, Poole raised his hands at Creighton. Poole claims that he raised his hands with both palms open, as an act of surrender. He concedes that he invited Creighton to hit him—but claims he did so sarcastically. Creighton exclaimed in response, "He just gave me consent to hit him."

After this exchange, Stalnaker instructed Poole to turn around. Creighton, who was standing closer to Poole, grabbed Poole's left arm and attempted to place it behind his back. Stalnaker tried to get Poole's right arm and again told him to turn around. Poole backed away from the officers and said, "Wait a minute. What are you doing?" The two officers twisted Poole around and pressed him against the side of his truck.

Creighton held Poole's left arm behind his back in a way that Poole claimed was very painful. Poole claims that Creighton continued to hold his arm in place while Stalnaker tasered him repeatedly.[2] Stalnaker then reached for Poole's right arm, but Poole tucked it into his chest and verbally and physically resisted Stalnaker's repeated stern commands for Poole to give it to him. Stalnaker briefly used his taser on Poole, which caused Creighton and Stalnaker to momentarily lose control of Poole. Poole climbed onto the fifth wheel of his truck and laid on his back, screaming that the officers had broken his arm. Poole claims that he does not remember how he ended up on the fifth wheel.

The two officers moved from the side of the truck to the back. Creighton tried to grab Poole, who continued to resist him by kicking him. Creighton held Poole in place, and Stalnaker then flipped Poole onto the ground, and yanked his arms to handcuff him. His left arm offered no resistance. It is undisputed that this was the first time that the officers understood that Poole's elbow had been

---

[2] The men were briefly off camera during the time that Poole claims Stalnaker tased him multiple times. During this time, Poole can be heard yelling loudly.

3

dislocated. They immediately called for medical assistance. While they waited for an ambulance to arrive, Poole continued to yell at the officers and squirm on the ground, but the officers took no further action to subdue him. As a result of his injury, Poole has undergone multiple surgeries. His left arm and hand suffer permanent disabilities.

Poole sued Stalnaker and Creighton, as well as the City of Shreveport ("the City"), and former chief of police Mike VanSant ("VanSant") (collectively, the "Defendants"), seeking damages for constitutional violations under 42 U.S.C. § 1983. Poole specifically alleged that (1) Stalnaker and Creighton used excessive force in violation of the Fourth and Fourteenth Amendments and (2) the City and VanSant failed to train and supervise Creighton and Stalnaker on the use of force and had failed to establish and enforce policies related to the use of force, traffic stops, or the conduct of off-duty officers. He also raised state law claims. Importantly, Poole alleged only that officers used excessive force in arresting him.

Defendants moved for summary judgment. Poole abandoned his state law claims and his constitutional claim against VanSant and the City to the extent he alleged that they failed to train Stalnaker and Creighton on the use of force. The district court granted Defendants' motion. First, the district court granted Creighton and Stalnaker qualified immunity on Poole's excessive force claim because Poole failed to show that his injuries resulted from excessive force that was clearly unreasonable given the circumstances of his arrest. And second, finding no genuine dispute over material facts with regard to whether VanSant and the City were deliberately indifferent to the rights of citizens, the district court also granted summary judgment on Poole's claim that they had failed to enforce policies regulating the investigation and detention of suspects by off-duty officers. The district court dismissed Poole's claims and entered judgment for the Defendants. Poole appealed.

No. 11–30158

## II

On appeal, Poole contends that the district court erred in (1) granting Creighton and Stalnaker qualified immunity on his excessive force claim and (2) dismissing his constitutional claim against VanSant and the City based on their failure to implement a policy, which, he contends, caused his injury.

We review the district court's summary judgment decision de novo, applying the same standards as the district court. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 464 (5th Cir. 1999). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). A fact issue is "material" if its resolution could affect the outcome of the action. *Id.* When reviewing summary judgment decisions, we construe all facts and inferences in the light most favorable to Poole, the nonmoving party. *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011). "A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

## A

Poole first contends that the district court erred in granting Creighton and Stalnaker summary judgment on his excessive force claims based on the affirmative defense of qualified immunity. Public officials such as Creighton and Stalnaker are entitled to qualified immunity on summary judgment unless (1)

No. 11–30158

Poole has "adduced sufficient evidence to raise a genuine [dispute] of material fact suggesting [the officers'] conduct violated an actual constitutional right," and (2) the officers' "actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). "Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Id.* This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

The parties do not dispute that the Fourth Amendment right to be free from excessive force during a seizure is clearly established. *See Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam) (explaining that an arrestee had a clearly established right to be free from excessive force and that it was clearly established that the force officers could use in her arrest depended on the circumstances). With regard to this right, the Supreme Court has explained:

> [T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted). "Excessive force claims are [thus] necessarily fact-intensive" and "depend[ ] on the facts and

No. 11–30158

circumstances of each particular case." *Deville*, 567 F.3d at 167 (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396).

Crucially, this analysis must be objective: To make out a Fourth Amendment violation, let alone one that violates clearly established law, "the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. We must evaluate an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Any "evil intentions" motivating an officer's objectively reasonable use of force "will not make a Fourth Amendment violation."[3] *Id.* at 397.

To overcome the officers' claim of qualified immunity on his claim of excessive force, Poole must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009); *see Deville*, 567 F.3d at 167 (addressing simultaneously the questions of whether the force was "excessive" or "unreasonable"). Within this qualified immunity inquiry, the parties dispute only whether Stalnaker's and Creighton's respective uses of force were clearly excessive and clearly unreasonable. These inquiries are often intertwined. *See Deville*, 567 F.3d at 167 (engaging these questions simultaneously). In determining whether the use of force was clearly excessive and clearly unreasonable, we evaluate each officer's actions separately, to the extent possible. *See Meadours v. Ermel*, 483 F.3d 417,

_____

[3] The dissent emphasizes facts that may have been relevant to a qualified immunity analysis in an unconstitutional arrest claim—a claim Poole has not raised. Thus, most of the facts that the dissent discusses are irrelevant to the excessive force qualified immunity analysis.

No. 11–30158

421–22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether qualified immunity applies).

**1**

The district court held that Poole failed to show that his injury resulted from clearly unreasonable excessive force based on the following reasons: (1) the officers were presented with a suspect who had been driving recklessly, smelled of alcohol, admitted to throwing liquid out of his truck with the intention of striking another vehicle, and confessed to drinking a beer before driving; (2) Poole raised his hands at an officer and actively resisted arrest; (3) the officers tailored the use of force to Poole's increasing resistance, beginning first with verbal commands, then physical force, and, finally, use of a taser; (4) Stalnaker's quick application and removal of the taser indicates his effort to minimize Poole's injury; and (5) after subduing Poole, the officers recognized that he was injured and called for medical assistance. The district court reasoned that in light of the circumstances this case presents, the officers' actions were neither clearly unreasonable nor excessive and rejected the importance of the events that triggered Poole's arrest.

Poole asserts that Creighton's and Stalnaker's use of force was unnecessary and unreasonable given the minimal severity of his crime and the minimal level of threat that Poole posed both during the traffic stop and when his elbow was injured, and because Poole did not actively resist arrest once force was initiated. Defendants respond that neither officer's actions were objectively excessive or clearly unreasonable.

**2**

**a**

Mindful that we must view the evidence in a light most favorable to Poole, *see Cooper Tire*, 423 F.3d at 454, we agree with the Defendants that neither officer's actions were objectively excessive or clearly unreasonable. Poole does

No. 11–30158

not discuss the officers' actions separately. His claim of excessive force centers on Creighton's and Stalnaker's combined actions; Poole particularly focuses his arguments on Creighton's actions. Regardless, those actions are not enough to support a claim of excessive force against either officer standing alone. We reiterate that Poole does not contest the legality of his arrest. Thus, in addressing the officers' claims of qualified immunity, our focus is necessarily on the force used during his arrest.

Viewing the evidence in the light most favorable to Poole—evidence which includes a videotape that captures much of the dispute underlying Poole's claims—we conclude that the force the officers used in arresting him was not objectively excessive or clearly unreasonable. It is undisputed that Stalnaker repeatedly commanded Poole to turn around and give up his right arm. It is undisputed that Poole did not do so. Poole's resistance was immediate and persistent. Stalnaker responded with verbal commands and attempted to grab Poole's arm, before resorting to a taser, which, the video reveals, he applied and withdrew very quickly. Creighton pinned Poole down when he refused to comply with Stalnaker's commands, and Stalnaker twisted Poole to the ground after Poole kicked and screamed at Creighton for reasons that were unclear. It was not until the officers restrained Poole that they realized he was injured; they immediately called for help.

Viewed objectively, Stalnaker and Creighton responded with "measured and ascending" actions that corresponded to Poole's escalating verbal and physical resistance. *See Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (explaining that the use of force was reasonable when it involved "measured and ascending responses" to a plaintiff's noncompliance). Poole's suggestion that a desire to avenge a personal insult motivated Creighton's actions makes no difference when viewed against the backdrop of his broader interaction with the two officers. *See Graham*, 490 U.S. at 397 ("An officer's evil

No. 11–30158

intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force."). This situation was "tense, uncertain, and rapidly evolving," and the officers' decision to use force to restrain Poole was objectively reasonable. *Graham*, 490 U.S. at 396. Because Poole, upon refusing to turn around and be handcuffed, posed an "immediate threat to the safety of the officers" and "actively resist[ed]" the officers' instructions, the use of force was not "clearly excessive." *See Deville*, 567 F.3d at 167.

Because Poole has failed to show that Creighton's and Stalnaker's use of force was objectively excessive or clearly unreasonable, the officers are entitled to qualified immunity on Poole's excessive force claims.[4]

**b**

The dissent has offered a classic example of what the Supreme Court has asked us to avoid in analyzing qualified immunity challenges. First, the dissenting opinion unmoors its analysis from the appropriate legal principles. *See Ontiveros*, 564 F.3d at 382. Rather than focusing its analysis on Creighton's entitlement to qualified immunity, the dissent seemingly analyzes the merits of Poole's excessive force claim. Second, even in reaching the merits of Poole's claim, the dissent misapplies the Supreme Court's directive in *Graham* to

---

[4] Poole's and the dissent's attempts to compare the facts of this case to those underlying this court's decision in *Deville v. Mercantel*, 567 F.3d 156 (5th Cir. 2009) are unpersuasive. In *Deville*, the plaintiff had been pulled over for exceeding the speed limit by ten miles per hour. *Id.* at 161. A second officer arrived on the scene, and when the plaintiff refused to roll down the window until her husband arrived, the officer broke the window with his flashlight, dragged the plaintiff out of the car, and threw her up against the car. *Id.* at 162. This court reversed the district court's grant of summary judgment in favor of the officer on the plaintiff's excessive force claims. *Id.* at 167. Poole contends that we should do the same in this case because he, like the plaintiff in *Deville*, was stopped for a minor traffic violation and posed no threat to the officers. Poole's case is not like *Deville*, however. The *Deville* court reasoned that the officer "engaged in very little, if any, negotiation with [the plaintiff]—and [ ] that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle." *Id.* at 168. In contrast, the officers in this case decided to place Poole under arrest only after he acted in a way that they reasonably perceived as threatening, and then used further force as necessary when Poole did not submit to the arrest.

10

No. 11–30158

engage in an objective analysis, focused on the use of force during arrest, in favor of an analysis infused with subjective, post-hoc assessments of the facts or centered on facts preceding Poole's arrest. The dissent also relies on distinguishable circuit case law. Interweaving these errors are "facts" that are either irrelevant or which are directly contradicted by videotape evidence.

It bears repeating that while we view all facts in a light most favorable to Poole, the burden remains on Poole "to negate the [qualified immunity] defense once properly raised." *Brumfield*, 551 F.3d at 326. Even on summary judgment, we cannot ignore that qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). The Supreme Court has instructed that our review is necessarily objective—reasonableness is our touchstone, and we lack any benefit of 20/20 hindsight. *See Graham*, 490 U.S. at 396–97. Officers' subjective intent is irrelevant. *See id.* at 397. Lastly, our focus is not on the merits of Poole's claim, but on Creighton's and Stalnaker's entitlement to qualified immunity. *See generally Ontiveros*, 564 F.3d at 382.

In spite of agreeing that these principles apply, the dissenting opinion makes its first mistake by narrowly focusing on *Graham* to effectively evaluate the merits of Poole's excessive force claim instead of the validity of Creighton's claim to qualified immunity. *Graham*, however, "expressed no view on [qualified immunity's] proper application." *Graham*, 490 U.S. at 399 n.12. Instead, our accepted qualified immunity analysis in the excessive force context focuses on "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *See, e.g.*, *Ontiveros*, 564 F.3d at 382.

Next, the dissent, even in applying *Graham,* disregards the touchstone of objectivity and casts its understanding of the events as they unfolded in a subjective light. Evidence of these misjudgments is the dissent's omissions of

11

No. 11–30158

key events as depicted by the videotape, in favor of Poole's often contradictory self-serving version of events.  The Supreme Court has provided the courts with clear instruction on how we are to regard videotape evidence in summary judgment review:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
> . . . [Where a] Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him[, t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Scott*, 550 U.S. at 380–81.  This court has construed the Supreme Court's instruction to require courts to reject a "plaintiff's description of the facts where the record discredits that description [and] instead consider 'the facts in the light depicted by the videotape.'"  *Carnaby*, 636 F.3d at 187 (quoting *Scott*, 550 U.S. at 381).

Yet the dissent repeatedly ignores the Supreme Court's instruction.  For example, the dissent accepts Poole's assertion that he did not actively resist the officers' commands, an assertion which is plainly contradicted by the videotape.[5] The videotape shows Poole, in response to Stalnaker's command to turn around and Creighton's attempt to handcuff him, backing away from the officers and then actively resisting their efforts to turn him around.  The dissent attempts

---

[5] The dissent riddles its analysis with facts like these that are overly sympathetic to Poole and controverted by the videotape.  For example, the dissent assumes that there was "no indication that he intended to flee," a statement that flies in the face of Poole's continued escalating resistance. More generally, the dissent focuses on seemingly disputed events taking place before Poole's arrest that have no bearing on the legality of the force Creighton used in assisting Stalnaker with effecting Poole's arrest and focuses on Poole's subjective perceptions instead of the legality of Creighton's and Stalnaker's use of force.

12

to characterize his resistance as "merely asking the basis of the instruction," and seemingly creates out of whole cloth a new legal rule that a defendant may resist arrest for "ten seconds" if he believes he has reason to do so.[6]  By repeatedly failing to give sufficient weight to the videotape evidence, the dissent grants Poole's version of events undue weight, *see Scott*, 550 U.S. at 381, and in turn fails to consider Poole's actions from the perspective of a reasonable officer.  *See Graham*, 490 U.S. at 396–97.

To bolster these errors, the dissent invokes this circuit's cases, both precedential and unpublished, and stretches them beyond recognizable limits. None of the dissent's citations persuade us that our decision to affirm the district court's grant of qualified immunity is legally wrong or that we have misunderstood material facts.  The dissent relies on *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000), in which this court, on summary judgment review, declined to extend qualified immunity to two officers on an individual's excessive force claim.  The court concluded that because the individual "suffered a broken shoulder as a result of being tackled by [the officers], who lacked

---

[6] The application of force to effect an arrest is not a parlor game in which the arresting officers must consider the arrestee's sensibilities.  Arrests are inherently dangerous and can escalate precipitously if the arrestee is not overcome immediately.  What the dissent fails to apperceive is that police officers will never know beforehand when such escalation will occur. *Cf. Olivarez v. State*, No. 07-09-00223-CR, 2010 WL 2756917, at *1 (Tex. App.—Amarillo July 13, 2010) (detailing an arrest, taking place during a traffic stop, which got out of control and resulted in the arrestee stealing a taser from the officer and then using it against him); *King v. State*, 161 S.W. 3d 264, 265 (Tex. App.—Texarkana 2005, pet. ref'd) (recounting that when an officer attempted to arrest a man during a traffic stop, the man resisted and eventually gained control of the officer's chemical dispensing device and sprayed the officer before the officer was able to subdue him); *Merritt v. City of Oakdale*, 01–1533 (La. App. 3 Cir. 2002); 817 So.2d 487, 488–89 (explaining that a mace can went off during struggle between officer and arrestee and hit the officer rather than the arrestee).  Here, the escalation was minimal; Creighton and Stalnaker applied only the amount of force necessary to subdue Poole. *See Collier v. Montgomery*, 569 F.3d 214, 218–19 (5th Cir. 2009) ("'The objective reasonableness of the force, in turn, depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible.'" (quoting (*Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)).

reasonable suspicion to detain or frisk him and from whom he was not fleeing[,] [a] fact issue therefore exists as to the objective reasonableness of the force used." *Id.* at 740. Driving this analysis, however, were the court's conclusions that material issues remained as to whether the officers had reasonable suspicion to detain Goodson or probable cause to arrest him. *See id.* at 736–40. Here, Poole has not contested the reasonableness of his seizure; he only disputes the amount of force used. *Goodson* thus lacks analytical force in assessing the reasonableness of Creighton's actions.

The dissent also cites to a recent unpublished case, *Anderson v. McCaleb*, No. 11–40237, 2012 WL 2299459 (5th Cir. June 15, 2012), in which this court reversed the district court's grant of summary judgment on a plaintiff's excessive force claim because "the magistrate judge erred in rejecting [the plaintiff's] account of his injuries." Specifically, the magistrate concluded, based on medical records, that a fracture was an old injury, even though the medical records were "silent as to the cause of the fracture and do not suggest that [the plaintiff] mentioned it was an old injury" and in fact revealed a range of other injuries consistent with his account. *Id.* at *4. By rejecting the plaintiff's injuries, this court explained that the magistrate overlooked "some contested evidence of significant injury to support the factual assertions of excessive force." *Id.* at *5. The magistrate's improper assessment of record evidence negated the "injury" element of the Fourth Amendment excessive force inquiry and thus tainted its evaluation of the reasonableness of the officers' actions. Whether Creighton or Stalnaker injured Poole is not in dispute; we thus fail to see *Anderson*'s persuasive value here.[7]

---

[7] The dissent's reliance on *Staten v. Tatom*, No. 11–10020, 2012 WL 975017 (5th Cir. Mar. 22, 2012) (unpublished), and *Bush v. Snow*, 513 F.3d 492 (5th Cir. 2008) yield similar results. In *Staten*, this court reversed summary judgment and denied officers qualified immunity on an excessive force claim because a number of key facts remained in dispute, including whether the plaintiff resisted and the amount of force the defendant used at each

No. 11–30158

The dissent effectively turns the qualified immunity analysis on its head by trying to contort this inquiry into one that evaluates the subjective merits of an officer's actions. The doctrine of qualified immunity, however, "shield[s] [officers] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Where a plaintiff resists as Poole did, and officers react with force that corresponds to the resistance, as both Stalnaker and Creighton did, it cannot be said that the officers' force is objectively excessive or clearly unreasonable; the Supreme Court therefore requires qualified immunity. *See id.* Irrespective of the dissent's subjective evaluation of this excessive force case which indisputably resulted in a serious injury, summary judgment does not require us to accept absurd factual

---

encounter, which needed to be resolved before the court could evaluate whether the defendant's use of force was reasonable. 2012 WL 975017, at **5–6. Neither of these two threshold facts are realistically in dispute here; thus, *Staten* is not applicable. *See id.* at *6. *Bush* similarly involved the question of when a plaintiff ceased to resist arrest that is lacking in this case. *See* 513 F.3d at 498–89.

The dissent also maintains that *Galvan* is distinguishable. In *Galvan*, this court concluded that the force used by officers was reasonable where police "were confronted with a rapidly evolving, volatile situation"; "reacted with measured and ascending responses—verbal warnings, pepper spray, hand- and arm-manipulation techniques, and then the use of a Taser"; and "did not use force until [the plaintiff's husband] attacked [an officer]." 435 F. App'x at 311. The dissent contends that *Galvan* does not apply here because Stalnaker pulled Poole over for a trivial traffic crime; Poole was cooperative; Stalnaker told Poole to turn around a single time before he and Creighton immediately pinned Poole against the truck; Poole never threw anything at Creighton or Stalnaker, nor did he tackle them, nor did he engage in a ground struggle; and Creighton proceeded to manipulate and break Poole's arm. *Galvan* is only distinguishable because it involved escalating resistance that resulted in increasing amounts of force, resulting in the plaintiff's husband's death; even on those more extreme facts, the court nevertheless concluded that officers' use of force was not excessive. Although in *Galvan*, the officers' use of force was greater to correspond to the greater amount of resistance the plaintiff's husband offered, like *Galvan*, the officers' use of force here similarly corresponded to the resistance offered by Poole.

15

allegations that are contradicted by videotape evidence.[8]  *See Scott*, 550 U.S. at 380–81; *Carnaby*, 636 F. 3d at 187.  Instead, it demands that we ask, ultimately, whether Poole has shown that Stalnaker's and Creighton's actions were objectively excessive and clearly unreasonable in light of Fourth Amendment law.  *See Ontiveros*, 564 F.3d at 382.  Neither Poole nor the dissent persuade us that he has.[9]

## B

Poole next contends that genuine issues of material fact preclude summary judgment on his claim that the City and VanSant failed to establish a policy implementing or enforcing Louisiana's policy against the use of public office for private gain.  *See* LA. REV. STAT. ANN. § 42:1101(B) (declaring as Louisiana policy "that public office and employment not be used for private gain.").

A § 1983 claim for the failure to establish a policy exists only where the "policies are the moving force [behind] the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)). "Only where a

---

[8] Further, seriousness of injury is not conclusive of the unreasonableness of officers' actions.  *See Galvan*, 435 F. App'x at 311 (no excessive force even where arrestee died).

[9] We also disagree with the dissenting opinion's conclusion that the alleged violation here was clearly established.  The cases the dissent cites in support of this conclusion, which all focus on clear cases of excessive force, do not put Creighton and Stalnaker on notice that their use of force here amounted to a constitutional violation.  *See Brown v. Long Beach Police Dep't*, 105 F. App'x 549, 550 (5th Cir. 2004) ("As the facts are not in dispute, it does not appear beyond doubt that [the plaintiff] will be unable to prove the elements of an excessive force claim."); *Goodson*, 202 F.3d at 740 ("A fact issue therefore exists as to the objective reasonableness of the force used."); *Randell v. Davis*, 986 F.2d 1419, No. 92–1695, at \*3 (5th Cir. 1993) (per curiam) (unpublished) ("[The] evidence reveals that genuine issues of material fact remain regarding the use of excessive force.").

Even in assessing whether this alleged violation was clearly established, the dissent neglects to address whether the officers' actions were *objectively unreasonable* in light of what the dissent characterizes as clearly established law.  *See Brumfield*, 551 F.3d at 326.  The dissenting opinion's failure to fully address the qualified immunity inquiry exposes the errors inherent in its conclusions.

municipality's failure to [establish a policy] in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (quoting *Monell*, 436 U.S. at 694). "Deliberate indifference is a stringent standard of fault" and requires a showing of "more than negligence or even gross negligence." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *City of Canton*, 489 U.S. at 388).

The district court held that Poole failed to demonstrate that the City or VanSant acted with deliberate indifference toward the rights of citizens. It emphasized that the Shreveport Police Department has policies regulating the use of force and traffic stops, which are similar to the International Association of Chiefs of Police model policies, and, moreover, that the Police Department's training program exceeds Louisiana's minimum requirements. The district court further explained that Poole provides no evidence of a pattern, or even another single incident, of alleged excessive force by off-duty officers and, further, no evidence to rebut the Defendants' expert's opinion that "[t]he administration of the Shreveport Police Department . . . appears to be reasonable and falls well within the generally recognized guidelines of the law enforcement community."

Poole maintains that the policies and practices of the Shreveport Police Department and VanSant exhibited deliberate indifference to Poole's constitutional right to be free from force.[10] He stresses that the Department and VanSant failed to properly train Department employees in circumstances where an employee's public office might come in conflict with his private disputes.

Poole invokes only *Cheatham v. City of New Orleans*, 378 So.2d 369 (La. 1979), to support his claim. In *Cheatham*, the Louisiana Supreme Court held

---

[10] The district court rejected Poole's claims against VanSant in his official and individual capacity. On appeal, Poole only disputes the district court's judgment to the extent it dismissed an official capacity claim.

No. 11–30158

that two off-duty police officers could be held liable in a wrongful death action by the widow of a man who was killed in a personal dispute with the officers. *Id.* at 379. While *Cheatham* discusses, for state law purposes, the complications inherent in altercations between off-duty police officers and private citizens, Poole does not explain how *Cheatham* supports his failure-to-train claim. Poole must show "deliberate indifference" on the part of the City and VanSant. *City of Canton*, 489 U.S. at 389. But Poole merely presents testimony from the officers that they were unaware of the Louisiana Code article that discourages the use of public office for private gain. Poole has simply alleged that the City failed to take "minimal precautions," and that this failure evidenced manifest disregard for its citizens' rights. He does not, however, support his conclusory allegations with a specific policy or a single other incident in which the City's failure to train led to the use of excessive force by police officers. *See Burge*, 187 F.3d at 471–72 (rejecting plaintiff's failure-to-train claim because "[t]here was no evidence of a single instance, much less a pattern, of [ ] violations").

Poole has not met his summary judgment burden.

**III**

For these reasons, we AFFIRM.

18

No. 11–30158

JENNIFER WALKER ELROD, Circuit Judge, concurring in part and dissenting in part:

I concur in the result on all of the claims except those against Corporal James Creighton ("Corporal Creighton" or "Creighton"). Viewing the facts in the light most favorable to plaintiff Roger L. Poole ("Poole"), fact issues exist as to whether Creighton is entitled to qualified immunity. Therefore, I would send Poole's excessive force claim against Creighton to the jury.[1]

I.

The majority opinion is correct that the videotape that captured most of the events relevant to this case "significantly aids our understanding" of them and that we must "view[] the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 381 (2007). Sincere respect for my able colleagues in the majority compelled me to review the videotape in this case yet again with a critical eye to those facts that the majority opinion impugns as false. Because the videotape evidence is so central to this case, I have included references to the precise times in the videotape that the different events occurred. To aid the reader in evaluating this evidence, the videotape is attached as an appendix to this dissenting opinion so that it can "speak for itself." *Id.* at 379 n.5 (publishing videotape of events relevant to an excessive use of force case and indicating that the majority was "happy to allow the videotape to speak for itself").

The majority opinion's disagreement about the videotape evidence only underscores why this case should go to a jury. Nowhere does the majority opinion indicate that Creighton would be entitled to qualified immunity under my understanding of the facts. Thus, at bottom, ours is a factual dispute, not a legal one, and thus a jury should resolve it.

---

[1] I agree with the majority opinion that Sergeant John D. Stalnaker, who did not employ the arm-manipulation techniques that caused permanent damage to Poole's left arm and elbow, did not use unreasonably excessive force.

No. 11–30158

Proceeding to the facts, Poole testified that he was driving down the interstate early in the morning when he looked in his rear-view mirror and noticed a pickup truck tailgating him. He tossed some water out his own truck's window at the tailgating pickup. What Poole did not know was that Corporal Creighton, an off-duty police officer, was driving the tailgating pickup. Creighton radioed for an on-duty officer to pull Poole over, and uniformed officer Sergeant John D. Stalnaker ("Stalnaker") arrived shortly to stop Poole for "driving recklessly and carelessly." Both Stalnaker and Creighton later testified that they only planned to give Poole a ticket.

Stalnaker and Creighton testified that they approached Poole's truck once he pulled over. As Creighton approached, he pulled his shirt up to reveal the service weapon he was carrying. Once Poole was out of his truck, Creighton grabbed his arm and pulled him to the back of his truck to pat him down. After the pat down, Poole leaned against Creighton's pickup. Creighton ordered Poole to get his "mother f---ing a-- off" his truck. He demanded "restitution" and told Poole that he knew where Poole lived; he would get "satisfaction"; and he would throw Poole's "f---ing a-- in jail." Stalnaker testified that because Poole smelled of alcohol and had admitted to consuming eight ounces of beer at some point earlier that morning, he was given a field sobriety test and passed. Other officers soon arrived on the scene to assist Stalnaker with paperwork. One of them asked what Poole had been pulled over for, to which Stalnaker responded, "[i]nsurance, improper lane use, littering, and general stupidity."

Poole testified that Creighton "was very angry" because Poole had thrown water on his truck. In what Poole testified was an effort to calm Creighton down, he offered to wash and wax Creighton's pickup and to allow Creighton to dump a nearby can of diesel fuel on his own truck. Those offers were declined, and according to Poole's testimony, Creighton still appeared to be very angry. In what he described as an attempt to de-escalate the situation, Poole lifted his

open hands into the air, palms facing out, and said that Creighton could hit him. Videotape at 8:09:55. Creighton queried whether Stalnaker had heard Poole's invitation. Stalnaker would later testify that, up to this point, Poole had been completely "cooperative," "calm," and "cool" and that he intended to let Poole go after issuing him a ticket. Upon learning that Poole had offered to allow Creighton to strike him, however, Stalnaker immediately commanded Poole to turn around. Videotape at 8:10:00 (five seconds after the "hit me" invitation). Creighton grabbed Poole's arm, prompting Poole to back away and ask why he was being ordered to turn around. Creighton spun Poole around and began twisting his left arm while Stalnaker pinned Poole to his truck. Poole began screaming seconds after Creighton began twisting his arm.

The videotape of these events shows that up to this point, neither officer had commanded Poole to give up his arm. Instead, such a command did not come until 8:10:22, ten seconds after Poole yelled to the officers, "[y]ou guys are breaking my arm." Videotape at 8:10:12. In the intervening ten seconds, Poole continued to scream. It turned out that Poole's estimate of the severity of his own injury was conservative: not only was his arm broken, but his elbow was also dislocated. After six surgeries and years of time to heal, he still has trouble using his left arm and hand.

Only after Creighton had been twisting Poole's arm for some time, and only after Poole screamed that the officers were breaking his arm, did one of the officers command Poole to give up his arm. Videotape at 8:10:22. Stalnaker tased Poole, and Poole fell belly up on the back of his truck. Stalnaker tased him again, and Poole kicked and flailed in Creighton's direction. The officers eventually lifted Poole by his center of mass off the truck's gas tank and threw him to the ground. After handcuffing Poole's broken arm to his non-broken one, the officers called an ambulance.

No. 11–30158

The majority opinion criticizes this understanding of the facts for "failing to give sufficient weight to the videotape evidence . . . and in turn fail[ing] to consider Poole's actions from the perspective of a reasonable officer." (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). It is true that we must "view[] the facts in the light depicted by the videotape." *See Scott*, 550 U.S. at 381 (2007). That does not mean, however, that we may usurp the jury's province to resolve factual disputes. Instead, as the majority opinion acknowledges, it is settled law that where the facts are in dispute at the summary judgment stage (as they are here), we view them in the light most favorable to Poole, the non-movant. *See, e.g.*, *Scott*, 550 U.S. at 378 (explaining that at the summary judgment stage, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion . . . In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts " (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) (alteration in original))). In sum, critical facts the majority opinion relies upon are in dispute and therefore must be viewed in the light most favorable to Poole.[2]

*Graham* explains that once we have determined the relevant set of facts by drawing all reasonable inferences in Poole's favor, we must then evaluate "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see also Hill v. Carroll County*, 587 F.3d 230, 234 (5th Cir. 2009) (explaining, in the context of

---

[2] For example, the videotape evidence does not clearly resolve all factual disputes, including: (1) whether Creighton twisted Poole's left arm behind his back or simply "held" his arm as the majority opinion describes Creighton's conduct; (2) whether Poole "climbed," presumably in an attempt to escape, or fell onto the fifth wheel of his truck after being tased by Stalnaker; and (3) exactly which actions by Poole were involuntary physical reactions to the application of the taser and those which were attempts to resist arrest. The majority opinion inappropriately views these factual disputes in the officers' favor.

No. 11–30158

an appeal of a qualified-immunity-based summary judgment in favor of officers over a defendant's excessive use of force claim, that "[w]hen reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts").[3]

## II.

"The doctrine of qualified immunity protects government officials 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Therefore, the qualified immunity inquiry has two prongs: (1) whether an official's conduct violated the plaintiff's constitutional rights,[4] and (2) whether the right violated was clearly established at the time of the violation. *Id.* at 232; *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). Courts may exercise their discretion in deciding which question to answer first. *Pearson*, 555 U.S. at 242.

---

[3] For instance, Poole claims that he raised his hands to surrender, but the officers claim that he raised them in a threatening manner. The videotape does not resolve that dispute. Drawing all inferences in Poole's favor, as we must at this stage, it is a fact that he raised them to surrender. Still, though, a reasonable officer could have perceived the gesture as a threat despite Poole's submissive intentions. When evaluating the reasonableness of Creighton's use of force, then, we must allow for the possibility that a reasonable officer could perceive it as threatening. On the other hand, in just one example of its failure to construe facts in the light most favorable to Poole, the majority opinion states that Poole "climbed" onto the fifth wheel of his truck immediately after Stalnaker used his taser on Poole. The majority opinion gives no explanation for why it draws this factual inference in favor of the officers. In short, it is the majority opinion that operates from an incorrect view of the facts.

[4] The majority opinion's repeated accusations that the dissent somehow ignores or disregards the Supreme Court's commands not to consider the merits in a qualified immunity case are mystifying. Indeed, the majority opinion devotes the entirety of its analysis to prong one, which the Supreme Court itself has described as the "merits" portion of the qualified immunity analysis. *Pearson*, 555 U.S. at 240 & n.2.

23

No. 11–30158

A.

To determine whether Creighton's use of force was excessive, and therefore a constitutional violation for purposes of the first qualified immunity question, we ask whether there was "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (citations omitted). We look only to the objective reasonableness of the use of force, "without regard to [Creighton's] underlying intent or motivation." *Graham v. Connor*, 490 U.S. at 397 (1989).[5] In *Deville v. Marcantel*, we explained that to determine "whether the force used is 'excessive' or 'unreasonable'" we apply the *Graham* factors, which include "the severity of the crime at issue, whether [Poole] pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." 567 F.3d 156, 167 (2009) (quoting *Graham*, 490 U.S. at 396).[6]

---

[5] The majority opinion is correct that Creighton's underlying motives, whatever they were, are irrelevant to our inquiry. *Graham*, 490 U.S. at 397. The majority opinion, however, alleges that the dissent considers facts that "are irrelevant to the excessive force qualified immunity analysis." Not surprisingly, the majority opinion has not explained exactly what facts the dissent has inappropriately considered, given that the legal standard for considering the objective reasonableness of the force used "depends on the facts and circumstances of the particular case . . . ." *See e.g.*, *Collier v. Montgomery*, 569 F.3d 214, 218-19 (5th Cir. 2009). In this case, these facts and circumstances include all of the events leading up to the time when Poole alleges that excessive force was used by Creighton. Without question, applying the *Graham* factors requires consideration of the events leading up to the time force was used—thus the majority opinion's criticism that the dissent inappropriately is "centered on facts preceding Poole's arrest" is difficult to comprehend.

[6] The majority opinion is mistaken in its criticism that "the dissenting opinion makes its first mistake by narrowly focusing on *Graham* to effectively evaluate the merits of Poole's excessive force claim instead of the validity of Creighton's claim to qualified immunity." Instead of applying *Graham*, the majority opinion would apply "our accepted qualified immunity analysis in the excessive force context, [which] focuses on '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.' *See, e.g.*, *Ontiveros*, 564 F.3d at 382." But this circuit developed the *Ontiveros* standard for the express purpose of administering *Graham* itself. *See Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991) (explaining that the three-part test from *Ontiveros* that the majority opinion references was created to implement *Graham*).

No. 11–30158

Objectively considering the facts and circumstances at the time the alleged excessive force was used on Poole, each of the *Graham* factors weighs in Poole's favor.

1.

First, Poole's alleged traffic violations were very minor. *Deville*, 567 F.3d at 167 (concluding that "substantially lower" amount of force was justified where a suspect "was stopped for a minor traffic violation . . . than if she had been suspected of a serious crime").[7]

2.

Second, no reasonable officer could have concluded that Poole posed more than a minimal threat to their safety or the safety of others. Poole was a fifty-six year old unarmed man whom Stalnaker and the defendants' expert described as "calm," "cool," and "cooperative."

---

In short, the majority opinion suggests replacing *Graham* with *Graham*.

The majority opinion's suggestion that it is improper to apply *Graham* in a qualified immunity case cannot be squared with the fact that the Supreme Court and this circuit have both applied *Graham* in qualified immunity as well as non-qualified immunity cases. *See, e.g.*, *Scott*, 550 U.S. at 381 (applying *Graham* in a qualified immunity case to determine whether Deputy Scott's actions violated the Fourth Amendment); *Hathaway v. Bazany*, 507 F.3d 312, 320-21 (5th Cir. 2007) (applying the *Graham* standard to determine whether an officer was entitled to qualified immunity from an excessive use of force claim). Finally, the majority opinion's criticism of reaching the merits under *Graham* is particularly confusing because the majority opinion does the very thing it criticizes:

> This situation was "tense, uncertain, and rapidly evolving," and the officers' decision to use force to restrain Poole was objectively reasonable. *Graham*, 490 U.S. at 396. Because Poole, upon refusing to turn around and be handcuffed, posed "an immediate threat to the safety of the officers' and 'actively resist[ed]'" the officers' instructions, the use of force was not "clearly excessive." *See Deville*, 567 F.3d at 167.

[7] This is based on the assumption that the minor traffic violations are the crimes at issue. The majority opinion does not suggest otherwise, and Creighton and Stalnaker never told Poole what he was pulled over for, what he was being arrested for, or even that he was under arrest at all. It is unclear what charges were brought against Poole, but it is undisputed that all charges against him were dropped.

No. 11–30158

Nevertheless, the majority opinion suggests that an objectively reasonable officer could have perceived Poole to have been a threat based on three of the factors it mentioned: (1) "Poole raised his hands at Creighton and invited Creighton to hit him"; (2) Poole's driving behavior; and (3) his recent alcohol consumption. As discussed above, the majority opinion is correct that even if we take Poole at his word that by holding his hands up in the air he only meant to de-escalate the situation and submit to Creighton, a reasonable officer could perceive such an action as a threat. *Hill*, 587 F.3d at 234 (explaining, in the context of a qualified-immunity-based summary judgment, that "when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts").

As for Poole's driving behavior, although he threw water out of his window, neither officer testified that the water throwing justified anything more than a ticket, much less the significant amount of force that Creighton used against him. Again, until Poole lifted his hands in the air (long after he threw the water), he was "calm," "cool," and "cooperative." Accordingly, Poole's driving behavior could not have justified Creighton's use of force in this case.

Poole's recent alcohol consumption is similarly irrelevant. It is undisputed that he drank only eight ounces of beer at some point that morning and then voluntarily took and passed a field sobriety test. A reasonable officer might perceive a belligerent drunk as a threat, but no reasonable officer could perceive a man who indisputably passed a field sobriety test as a threat merely because he consumed eight ounces of beer at some point that morning.

Accordingly, except for Poole's raising his hands in the air, palms up, none of the majority opinion's reasons for concluding that a reasonable officer could have perceived Poole to pose a threat is persuasive. Although virtually all

26

No. 11–30158

arrestees pose some level of threat to officers,[8] no reasonable officer could think it appropriate to apply such significant force to Poole's arm simply because he lifted his hands in the air. *See, e.g.*, *Deville*, 567 F.3d at 167 ("Officers must assess not only the need for force but also 'the relationship between the need and the amount of force used.'" (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999))).

3.

At the precise time that Creighton applied the force that caused Poole to scream, "[y]ou guys are breaking my arm," Poole had not yet actively resisted the officers. Videotape 8:10:12. The majority opinion says that it is undisputed that Stalnaker "repeatedly commanded Poole to turn around and give up his right arm," and "it is undisputed that Poole did not do so," but the videotape shows that Poole was not commanded to give up his arm until after Creighton twisted it so hard that Poole screamed. Videotape 8:09:55-8:10:22.[9] Indeed, the majority opinion's account of the facts confirms that Creighton applied the force at issue to Poole's arm *before* the officers commanded him to give up his arm:

> After this exchange, Stalnaker instructed Poole to turn around. Creighton, who was standing closer to Poole, grabbed Poole's left arm and attempted to place it behind his back. Stalnaker tried to get Poole's right arm and again told him to turn around. Poole backed away from officers and said, "Wait a minute. What are you

---

[8] The majority opinion is undoubtedly correct that an arrest is "not a parlor game." The regrettable fact that some arrests go horribly out of control does not relieve us of our responsibility to analyze the degree of force used to effectuate this arrest according to precedent. Specifically, Supreme Court precedent requires a careful evaluation of the reasonableness of the force used in light of the circumstances of the *particular* arrest at issue. *See Graham*, 490 U.S. at 396.

[9] The majority opinion indicates that the officers first realized Poole was injured when they handcuffed him and felt that his arm was limp. In light of Poole's unmistakable screams and insistence that his arm was broken, both of which are on the videotape, the majority opinion's view is difficult to square with our duty to view the facts in the light most favorable to Poole.

doing?" The two officers twisted Poole around and pressed him against his truck.

Creighton held Poole's left arm behind his back in a way that Poole claimed was very painful. Poole claims that Creighton continued to hold his arm in place while Stalnaker tasered him repeatedly. Stalnaker then reached for Poole's right arm, but Poole tucked it into his chest and verbally and physically resisted Stalnaker's repeated stern commands for Poole to give it to him.

Therefore, Poole's refusal to give up his arm could not have justified the force Creighton used in this case. *See also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (holding that refusing to release arms for handcuffing was not active resistance).

The officers also claim that Poole refused their command for him to turn around and that such refusal was active resistance. The videotape shows that Creighton forced Poole to turn around less than ten seconds after Stalnaker's "turn-around" command. Videotape 8:09:55-8:10:10. During the intervening ten seconds, Poole asks what Creighton is doing and says "excuse me." Videotape 8:09:55-8:10:10. Merely asking the basis of the instruction could not possibly count as the "active resistance" that *Graham* instructs courts to consider. *See Deville*, 567 F.3d 156 at 167 (applying the *Graham* factors and concluding that refusing an officer's command to exit the vehicle is passive, not active, resistance); *see also Phillips v. Cmty Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (applying *Graham* factors and distinguishing between active and passive resistance); *Cyrus*, 624 F.3d at 863 (holding that refusing to release arms for handcuffing was not active resistance); *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) ("[W]e draw a distinction between a failure to facilitate an arrest and active resistance to arrest.").

Indeed, in *Goodson v. City of Corpus Christi*, we found a similar use of force excessive where a suspect put up significantly more resistance by yanking

No. 11–30158

his arm away from an officer and backing away from him in retreat from a command to turn around and put his hands behind his back. 202 F.3d 730, 740 (5th Cir. 2000). Even if not turning around immediately does constitute active resistance, however, no reasonable officer could think it justified breaking Poole's arm and dislocating his elbow. *See Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009) (holding that "de minimis or inconsequential resistance does not justify a substantial use of force"); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006) (holding that passive resistance did not justify significant use of force).

4.

Taking all of the factors together, the *Graham* analysis cuts in Poole's favor. He was pulled over for a minor traffic crime and offered virtually no active resistance. The only aspect of his actions that could have justified the use of any force was the "threat" he posed, and the only evidence that he posed a threat was that he lifted his open hands into the air. No reasonable officer could conclude that breaking his arm and dislocating his elbow was an acceptable response to Poole's conduct.

The majority opinion can conclude otherwise only by failing to analyze the relationship between the degree of force necessary to subdue Poole and the degree of force used—a clear deviation from the excessive force standard that is now long-settled in our circuit. *See, e.g.*, *Deville*, 567 F.3d at 167 ("Officers must assess not only the need for force but also 'the relationship between the need and the amount of force used.'" (quoting *Gomez*, 163 F.3d at 923)); *see also Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009) ("'[T]he need for force determines how much force is constitutionally permissible.'" (quoting *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008))); *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996) ("In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that

force." (citing *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir. 1993))). Without performing this aspect of the excessive force analysis, the majority opinion gives itself the simple task of proving that some amount of force was constitutional, and excuses itself from the much more difficult task of explaining how any reasonable officer could believe that this much force was necessary to subdue this suspect.

5.

Our circuit's case law confirms that "the facts that [Poole] has . . . shown (see [Fed. R. Civ. P.] 56) make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232. In *Goodson*, we held that fact issues precluded summary judgment in favor of Officers Gaines and Perez on Goodson's claim that they violated his clearly established Fourth Amendment right to be free from excessive use of force. 202 F.3d at 740. The officers attempted to arrest Goodson for assault, commanding him to put his hands on Gaines's car. *Id.* at 734. Like Poole, Goodson testified that he was startled and demanded to know the basis of the officers' actions. *Id.* The officers replied that he was being detained and to put his hands on the car. *Id.* Before Goodson could comply, Gaines grabbed his arm. *Id.* Goodson pulled his arm away and stumbled backward to "maintain a little distance from the police officers." *Id.* At that point, the officers tackled him, broke his shoulder, and handcuffed him. *Id.* We held that "a fact issue . . . exists as to the objective reasonableness of the force used," and reversed the district court's grant of qualified immunity in favor of Gaines and Perez, remanding for a trial on the merits. *Id.* at 740.

Goodson was suspected of assault, a much more serious crime than Poole. Goodson also put up significantly more resistance than Poole. Goodson pulled his arm away and attempted to back away from the officers. Poole, at worst, simply delayed turning around for ten seconds. The officers broke Goodson's shoulder, an injury similar to—but perhaps not quite as serious—as Poole's broken arm

No. 11–30158

and dislocated elbow. Thus, Creighton was on notice that the force he used against Poole violated his constitutional rights.

In *Deville*, an officer stopped Deville for a minor traffic crime, and told her to exit her vehicle. 567 F.3d at 162. She refused and rolled up the window, prompting the officer to radio the off-duty chief of police. *Id*. The chief arrived on the scene and told Deville he would break her window unless she exited. *Id*. She still refused to exit, prompting the officers to smash her window, pull her out, and press her against the car. *Id*. We reversed summary judgment on Deville's excessive force claim, reasoning that "there [was] a factual dispute over the nature of [her] resistance." *Id*. at 167. We held that because Deville had merely refused to comply with the officers' commands, the officers used excessive force when they smashed her against the car. *Id*. While some force may have been appropriate to gain her compliance, the jury "could reasonably find that the *degree* of force the officers used . . . was not justifiable." *Id*. at 168.

Both Deville and Poole were stopped for minor traffic violations. *Id*. at 156. Just as officers demanded that Deville exit the car, Creighton and Stalnaker repeatedly demanded that Poole give up his arms—though only after Poole had begun to scream from Creighton's use of force. Poole offered even less resistance than Deville. Moreover, Deville suffered injuries far less serious than Poole's: contusions to her wrists, neuropathy of her hands, a right shoulder strain, left shoulder bruising, cuts caused by broken glass, and elbow and jaw pain. *See id*. at 168 (explaining that "courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary"). Given that we concluded that the use of even less force was an unreasonably excessive response to even more resistance, it is clear that Creighton violated Poole's rights in this case as well.

The majority opinion's attempt to distinguish *Deville* falls short. Pared down to essentials, the majority opinion distinguishes *Deville* because the

31

No. 11–30158

officers in this case decided to place Poole under arrest only "after he acted in a way that they reasonably perceived as threatening." But in *Deville*, we also discussed the potential reasonableness of an officer's perception that Deville might have used her vehicle, which she remained in with the motor running, as a weapon. *Id.* Accordingly, she posed at least as much of a threat (if not more) than Poole, who was not in his vehicle and merely lifted his opened hands.

Similarly, in *Anderson v. McCaleb*, we reversed a summary judgment in favor of two Texas police officers and their supervisor, concluding that they had violated Anderson's right to be free from excessive use of force under the Fourth Amendment. No. 11-40237, 2012 WL 2299459 (5th Cir. June 15, 2012) (per curiam) (unpublished). Anderson was driving his car when Officers Lanie Smith and Brant Smith attempted to stop him. *Id.* at *1. Anderson fled on foot, and the officers gave chase. *Id.* Eventually, Anderson turned around and "held out his hands in an attempt to surrender." *Id.* at *1. Anderson was holding an iPod, which the officers mistakenly, but reasonably, thought was a weapon. *Id.* at *2. They proceeded to tase him, and Officer Brant Smith hit him with a closed fist. *Id.* at *1. Once they handcuffed Anderson, the officers slammed him on the ground. Anderson testified that he did not resist the officers' attempt to arrest him. *Id.* He suffered a sprained knee, a fracture of his right hand, and less serious injuries to his neck and back. *Id.* We held that clearly established law put the officers on notice that they "could not continue to shock Anderson with the taser after he was no longer resisting arrest." *Id.* at *13-*14. We also held that, under clearly established law, the officers should have known that they "could not beat Anderson after he stopped resisting arrest or slam Anderson to the ground after he was handcuffed." *Id.* We drew these conclusions even though Anderson "turned around with an object in his hand [which the officers mistook for a weapon] after fleeing from police, justifying Officer Lanie Smith's initial use of the taser." *Id.* at *15.

32

No. 11–30158

Anderson's injuries were similar to Poole's, but the officers had even greater justification for using force against Anderson. He fled, and the officers reasonably thought he posed a serious threat because it appeared that he had a weapon. Yet we held that a similar amount of force to that used against Poole was unconstitutionally excessive. *A fortiori*, the amount of force Creighton used against Poole, who did not flee and posed less of a threat to a reasonable officer was even more clearly unconstitutional. Still other cases from our circuit support this conclusion. *See, e.g.*, *Staten v. Tatom*, No. 11-10020, 2012 WL 975017 (5th Cir. Mar. 22, 2012) (per curiam) (unpublished) (reversing summary judgment and holding that officers were not entitled to qualified immunity to plaintiff's Fourth Amendment excessive force claim where officer tackled automobile theft suspect to the ground after confiscating suspect's firearm and there were disputed fact issues regarding whether and to what extent plaintiff resisted); *Bush*, 513 F.3d 492 (holding that officers were on notice, under clearly established law, that slamming battery suspect's face into a vehicle when she was not resisting or attempting to flee and causing injuries was an excessive use of force that violated suspect's Fourth Amendment right to be free from unreasonable seizure).

The majority opinion relies heavily on *Galvan v. City of San Antonio*, a case that we dismissed because of the officers' "measured and ascending responses." 435 F. App'x 309, 311 (5th Cir. 2010) (per curiam) (unpublished). *Galvan* does not justify the majority opinion's holding. There, the officers responded to a 911 call reporting gunshots in a rough neighborhood. *Id.* at 311. Galvan fled after the officers identified themselves as police. *Id.* When the police gave chase, Galvan threw something at them. *Id.* The officers responded by attempting to negotiate. *Id.* In response to those negotiations, Galvan charged at the officers and tackled one of them. *Id.* Only after a ground struggle ensued did the officers use arm-manipulation techniques and tase Galvan. *Id.* We held

that the officers did not use excessive force because they reacted only with "measured and ascending responses." *Id.* In contrast, Stalnaker pulled Poole over for a trivial traffic crime. Poole did not flee, but rather, in Stalnaker's words, "was cooperative." Unlike *Galvan*, Stalnaker told Poole to turn around a single time before he and Creighton *immediately* pinned Poole against the truck. Poole never threw anything at Creighton or Stalnaker, nor did he tackle them, nor did he engage in a ground struggle. Creighton proceeded to manipulate and break Poole's arm. As in *Deville*, Creighton "engaged in very little, if any, negotiation with [Poole]." *Deville*, 567 F.3d at 168. Simply put, *Galvan* provides no support for taking the instant case away from the jury.

In summary, viewing the facts in the light most favorable to Poole, Poole has demonstrated that Creighton's use of force violated his constitutional rights. Specifically, after Poole was pulled over for a minor traffic violation, put up no active resistance, and gave no indication that he intended to flee,[10] Creighton used clearly excessive and unreasonable force that undisputedly broke Poole's arm and dislocated his elbow.

## B.

Having demonstrated that Poole has satisfied prong one of the qualified immunity analysis under *Graham* and this circuit's case law, I turn briefly to prong two. The majority opinion does not decide prong two of the qualified immunity analysis because it concludes that Poole cannot show a constitutional violation, but it notes that the parties do not dispute that the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232 ("Second, if the plaintiff has satisfied [prong one], the court must decide

---

[10] The majority opinion states that "Poole's continued escalating resistance" was an indication that he intended to flee. It is unclear what "continued escalating resistance" the majority opinion references, and there is neither evidence in the record nor even argument from counsel that could plausibly support an intent to flee.

whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."). Poole has satisfied prong two because he has shown that "at the time of the challenged conduct, [December 19, 2006,] 'the contours of [the] right [were] sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640). Several pre-2006 cases from our circuit put Creighton on notice that the actions Poole has alleged would have violated Poole's rights. *See, e.g.*, *Brown v. Long Beach Police Dep't*, 105 F. App'x 549 (5th Cir. 2004) (per curiam) (unpublished) (clearly established right violated where, in the course of arrest for truancy, officers tackled suspect to the ground causing her pelvis to break); *Goodson*, 202 F.3d 730 (clearly established right violated where officers tackled assault suspect, breaking his shoulder, after he refused to turn around and put his hands behind his back); *Randell v. Davis*, 986 F.2d 1419 (5th Cir. 1993) (per curiam) (unpublished but precedential) (clearly established right violated where suspect fled from officer after minor traffic violation, and, after being handcuffed, officer hit him in the eye with a flashlight causing injury that required stitches).

## III.

Because fact issues exist as to whether Creighton is entitled to qualified immunity, I respectfully dissent from the affirmance of summary judgment for Creighton. I concur in the affirmance of summary judgment in favor of all other defendants.